In this case on the docket, 2-16-1106, Michelle O. Rossek, plaintiff's appellant, in the name of Mr. Gavran, in the amnesty court system, defendant on behalf of me, arguing on behalf of my appellant on behalf of me, Mr. Julian H. Tushin, arguing on behalf of the plaintiff's appellant, Mr. Daniel T. Smart. All right, Mr. Smart, on behalf of the appellant, you may proceed. Good morning, your honors, counsel. May it please the court. We're here today seeking reversal of the circuit court's dismissal of plaintiff's complaint, that it was time barred. Specifically, we have a case here where the plaintiff was treating with a primary care physician dating back prior to 2010. She had a course of treatment over the course of five years, at which time she was being treated by the defendant primary care physician, during which time she had no knowledge of a brain tumor that was growing inside her head. This is the exact type of fact pattern that our Supreme Court in Cunningham sought to protect against. Was Cunningham a case that involved the failure to notify the plaintiff of test results? Or was it a little different context? Cunningham is a little bit different context in the sense that Cunningham just says that we have this repose period that says it's a four-year cutoff regardless of whether or not you know or not. And Cunningham said, well, if there's a continuous course of negligent treatment... What was the negligent treatment? Well, in this case, right, so we have a February 23, 2010 CT scan that was communicated to the defendant physician. Over the course of the next five years, that defendant physician did not treat the plaintiff in a way that, you know, she should have in terms of reviewing the CT scan. And if she did review the CT scan, then on each of the office visits that she saw her on over the course of five years... That's the same negligence that occurred initially. It's not the same negligence. It's different because you kind of have two different paths, right? You have the path where the defendant doctor might not have initially reviewed the CT scan. We have an expert that says in our 2-622 that down the road, even if she didn't initially review it, during the course of physical examinations, annual physical examinations, that physician has a duty to review prior hospitalizations, prior radiology studies, prior labs, those sorts of things. This is case square with the Turner case. I mean, what you're arguing is, of course, and one can see in the real world, it sort of leaves the patient in a very vulnerable position to think you rely on the physicians to discuss test results with you. But didn't the appellate court in Turner hold that the failure to notify the plaintiff of test results does not constitute medical treatment within the meaning of the continuous course of medical treatment? So Turner, in essence, was saying, well, they should have been informing the patient, I think it was every six months after they knew about the test result. But there were no office visits, right? There was no subsequent treatment. And that's the big distinguishing factor here from both Turner and Ferrara. Ferrara is what the circuit court relied on, and Ferrara is saying, well, it kind of expands a little bit more on Turner to say that you need some sort of subsequent affirmative act. And the Turner case actually is very instructive in terms of what's considered to be a subsequent affirmative act that they say is needed to be a continuous course of negligent treatment. And they say, in reliance on, and they cite favorably to outside jurisdictions, they say, what is an act in terms of medical treatment? And they specifically state an office visit. And that's what we have in the complaint. Well, plaintiff and Turner, the court rejected the plaintiff's ultimately position, correct? Correct. But the rejection was, so there wasn't any, what they deemed to be medical treatment. So notifying somebody without any other type of either surgery, office visit, or the like, that's not affirmative medical treatment. That doesn't require medical expertise. So you're saying that Turner's distinguishable on the basis that here we had office visits and in Turner they did not? Absolutely. And because they specify that, right? They say an act, a subsequent affirmative medical treatment would be considered an office visit. And then Ferrara goes on to say that there was no, there were no subsequent affirmative acts in the form of medical treatment that would, in essence, have the, put a duty on the defendant to, you know, in essence, breach that duty and act negligently. We have in this case, over the course of five years, a primary care physician who patients, individuals around the country rely on year to year for annual physicals to, you know, in essence, treat their whole body systems. This case went out on a motion to dismiss. Correct. Went out on a plea. Correct. What did you plead was the continuous course of medical treatment to toll the running of the statute? So the continuous course of medical treatment was the course of office visits with a primary care physician that had been treating the plaintiff not only prior to the February 23, 2010 CT scan, but then continued to treat her until... What was she being treated for? Well, as a primary care physician, you're treating, you know, the patient for your overall systems, right? So all outside labs, outside images, outside records are all relayed to your primary care physician. If I can call out the essence of your position, if you go to the doctor for a routine physical and you have a scan that's abnormal and then you return to the doctor because you have the flu or something, your position is that's continuous course of medical treatment. Well, the position that we take and we have a physician expert that would testify to the effect of, we're not saying every single time you go in because you have a cough, right, that your primary care physician has to review all your past medical records. No, that is what you're saying. No. That is what you're saying because in order to rule in your favor, we would have to adopt that position. But that's not the position to adopt because if that CT scan is communicated, right? If the CT scan has nothing related at all to anything the patient is coming in for and the doctor doesn't examine that because he's treating the flu, is that negligent medical treatment? It's negligent if the doctor has the knowledge of that prior CT scan. If his knowledge of the prior CT scan didn't inform him, he was negligent there, didn't inform him that there's a tumor, he's not going to look at it again if it has nothing to do with the treatment for the flu or for psoriasis or for whatever else ails the patient. Right. If it didn't show, if it did show that there was something which is alleged in this case, then that would be something, as we've alleged, that needs to be monitored, that needs to be treated. So if it's communicated and then you go down the other path, so if it is communicated the doctor has knowledge of it, right, then you have to monitor it, you have to refer the patient out to either radiology tests or someone of a subspecialty. Because here's what I think the cases might be saying. When you're talking about the continuous course of medical treatment, I think implied but perhaps left out of the equation is continuing course of medical treatment for the condition related to the alleged negligence. That's just what we're kind of saying. If you go in there, okay, for a broken arm and then later on you're treated for other things that have nothing to do with that, is that a continuous course related to the original problem? From a primary care physician perspective, we're arguing yes. I mean, yes, that is. Because looking at it on the flip side, then you'd be saying, well, the physician can either miss or see that initial scan that reveals an abnormality. And if it's just ignored long enough to get outside in four years, then it's pretty unclear. I guess the struggle under the case law would be, doesn't the treatment have to relate to the original condition of the negligent? Yes. Well, you're saying it's reviewing. Of course, if the patient is in there and being treated for a condition where the X-ray reveals an abnormality and you're treating a condition caused by the abnormality, I think your point carries the day. The struggle is if the subsequent visits don't relate to anything to do with the negligent act. Would a doctor necessarily go back and look at something that happened five years ago if he's treating somebody for a broken leg? No, but that's going under the assumption that the doctor wasn't aware of something previously. And that's the distinction in this case. The doctor was, as alleged, aware of and or it was communicated to. Well, then why would you need even the phrase continuous medical treatment? Obviously, the doctor was aware or should have been aware of the scan on the brain tumor, so that should be the ballgame. There would be no reason to have a rule that talks about continuous medical treatment. Well, it would if the doctor is going to treat the patient based off of that scan over the next five years without knowing. Well, was the doctor treating the plaintiff for the condition related to the scan? Specifically the brain tumor? No, if it's asymptomatic, then that's a little bit different, but you still have knowledge of that scan. Regardless of if you're going to treat it symptomatically or asymptomatically, you still have knowledge of that scan. And what we say and what our expert says is that you have to monitor that. And failing to monitor that, that's something that occurs over the course of five years. So if it's something that you don't have to go right in and deal with at that moment, that's fine, but you have to monitor it. Respectfully, that's what is reported. In medical malpractice cases, you have to have a physician testify to what the standard of care is. I'm sorry, Justice. This is a medical malpractice suit, isn't it? Correct. And you have a retained expert? Well, we have a consulting expert at this point. Okay. What was this expert's opinion as to the duty that supposedly was breached that resulted in damages? Well, so the duty that was breached was failing to, as we've alleged, failing to, if she didn't review, review, but then refer out and or monitor. We might not have to jump to the conclusion to say you need to go see a neurologist right away, but monitor it, right? Do a CT scan. And then we have, as part of the certificate, that in May of 2014, the patient develops. When you said this is what the expert said, did this expert say that this duty continues until such time as it has been satisfied or discharged? It seems like we're arguing about an expert opinion that seems somewhat ambiguous to the extent that if you claim that you should prevail, then your expert should be testifying that this duty is ongoing and continuous, and really, why would he even have to say that there had to be an office visit if supposedly you have an expert opinion that claims that there was supposed to have been some additional action taken? No, it's not there had to have been an office visit. There was an office visit, and that's the subsequent affirmative medical treatment is the office visit. Well, did your expert testify that the duty was breached when he failed or the doctor failed in the first instance, or is your expert going to opine that the breach was not only at that time, but it was at every single instance where the doctor conferred with the patient about the patient's general health? And that's one of the things that I think... You didn't answer my question. Right, no. So the answer specifically to each individual office visit is no, but when you have a primary care physician that performs annual physical examinations, the expert will opine that at that point in time, you're doing a full body examination, you're coming up with, you're reviewing prior hospitalizations, prior labs, prior radiology studies. You're basically examining prior medical records on every annual review. Right, but if you do it on an annual basis, then you see it and you can continuously treat. You don't have to go back on the fifth year and look at year one. You can look at year two, you can look at year one and so on and so forth moving forward. So at that point in time, if you would have looked at it, you would have seen, oh, we have a CT scan from a year ago or two years ago. We need to monitor that a little bit closer. We need to maybe refer you out to a neurologist, something along those lines. The premise is that, for your argument, is that the doctor missed the tumor in the initial evaluation, correct? It can really go both ways. According to the certificate, the 622 certificate, that's what it is, that required Dr. McCarvin to review any radiology reports and become part of the patient records, blah, blah, blah. The standard of care also required the doctor to inform him. But if he doesn't see it, if the doctor doesn't see the tumor, then... Right, so then that's the failure to review. So the point is that what subsequent treatment related to that failure to initially diagnose the tumor? Well, that goes to the duty of a primary care physician in treating the entire systems of... But doesn't that really, I mean, when the Supreme Court said the purpose of the statute of repose, the specific purpose is to curtail the long tail of exposure to medical malpractice claims brought about by the advent of the discovery rule, and it can lead to harsh consequences. But that's what the court said. Right, and the court also said that the cumulative results of continued negligence is the cause of the injury. Then the statute of repose can't start to run until that negligent treatment ends, which we have in this case. And they specifically state the reason for that is because you don't want to have some form of unjust result like we have here, where a patient doesn't know of a brain tumor that's grown for five years, unfortunately outside of the four-year statute of repose, before she learns about it, because her primary care physician had that information. Do I have one more question? Thank you. All right, thank you, Mr. Smart. You'll have time to address the court. Thank you. Thank you. Sasha, on behalf of the appellee, you may proceed. Thank you. Good morning. Julie Fisher on behalf of the defendants, Dr. Gavran and Mercy Health Systems. I want to address a few initial points that you have raised. The Cunningham case does not deal with a failure to report test results. The Cunningham case deals with physicians who saw a patient over a period of years for the same condition. They placed an IUD. The patient had problems resulting from the IUD, bleeding, cramping, saw physicians over a number of years for that same issue, came back, they performed a tubal ligation, removed one IUD but didn't remove the first IUD. The patient returned with all kinds of continuing complaints related to that care. So two things, factually distinguishable, and it did not involve the failure to report abnormal test results. Can I ask you sort of a blunt question? Sure. Let's address this last point. Isn't the result here, if we uphold the dismissal of the case, isn't that sort of a harsh and unfair result? But that's something that the General Assembly and the reviewing courts have accepted in order to effectuate the purpose behind the statute of repose. The General Assembly thought that there was a medical malpractice crisis in the state of Illinois. With the advent of the discovery rule in the statute of limitations, there was a long tail to the claims made under medical malpractice actions. And the General Assembly saw physicians fleeing the state, insurers raising their premiums to the point where doctors couldn't practice. And in order to address that crisis, is the term they used, they enacted the statute of repose. And the Illinois Supreme Court and the reviewing courts have said that while the statute of repose can often result in harsh consequences, including barring the plaintiff's action before they're even aware of it, that the policy considerations behind the statute of repose prompted them to enact the statute even though there will be harsh consequences. So in the real world, how would a patient ever protect themselves against a situation that occurred here? Under the law, under the statute of repose and the way it's interpreted, there is no help for a claimant like Ms. Tusek in this case. The effect of the law here, as enacted by the General Assembly, is four years after the act or omission that's complained of, there's an absolute bar to the bringing of an action. And that's true whether or not the patient ever knows they have an action or whether they ever discover that they have an action. During any of the nine visits, I think there were nine visits to the doctor after the initial failure to see the tumor, was the subject matter of the, for example, headaches or any issues that would have alleged in a complaint that would have drawn the doctor's attention back to that CT scan? We don't know that, Justice Burkett, because it wasn't pled. And that's part of the problem. The plaintiff was given an opportunity to read the plea, correct? And that's part of our waiver argument. You know, the trial court was faced with this dilemma. The allegation you've put before me involves the failure to report an abnormal test result, a test result in 2010 that you're suing for in 2016. That's fired by the statute of repose. You haven't given me any factual allegations in the four corners of your complaint that establish any continuing care, let alone continuing negligent care. What about his argument that he had, let's take these to face as some intuitive appeal, but he's saying, okay, but you continue to see the same physician, which would imply review of previous records and tests. So does it bring it within the ambit of ongoing medical treatment? No. And even if it did, that's still insufficient. Under Cunningham, even if we accept that Cunningham applies here, and it doesn't because this court in Ferrara and the first district in Turner and Hanks have stated unequivocally that the continuous course of negligent medical treatment doctrine does not apply to the failure to report abnormal test results. But even if we accept that somehow in the four corners of the plaintiff's complaint we can tell that there was a duration of treatment, continuing to see a patient is insufficient under Cunningham. The Illinois Supreme Court was very clear about that. In fact, they rejected the appellate court's use of that term. The appellate court in Cunningham said it's enough to continue to see the patient. The Illinois Supreme Court said, oh, no, it's not. It has to be a continuous course of negligent treatment. So we don't have any more. So in other words, if you, as Mr. Spartan has posited the situation, if you have a failure to communicate an abnormal test result, brain scan, PSA test, whatever the case is talked about, but you continue to go in and see your physician for an annual wellness check, that would not bring you within the protection of the case, just because you're in there for a general checkup. It does not. It does not. Cunningham says it has to be a continuous and unbroken course of negligent treatment that was so related as to constitute one continuing wrong. So you've got continuous, unbroken, negligent treatment, so related as to constitute a continuing wrong. We don't have any of that in the body. So what would have been a continuous course of treatment in this case when you overlook a brain and abnormal brain scan? I don't know. I don't know. I don't know what she went back in to see the physician for. This was her primary care physician. It might have been for a sinus infection. It might have been for a swollen ankle. It might have been for a fever. If it had been for headaches, you'd agree that that probably would have, if it had been for headaches, migraines, something to do with the head, that probably would have drawn an N, right? I don't know that. Unless we have an allegation saying this is what you were seen for, this was a deviation because this symptom. What about neurological deficits, pain in the arm and the leg? Would that have drawn an N? I don't think so. Under Ferrara and Hanks, we know this from Hanks. Hanks is the most recent case on whether the failure to report abnormal test results can constitute a continuous course of negligent medical treatment. And the Hanks court said no. In Hanks, we know that the plaintiff was seen later. Hanks involved a liver biopsy that was abnormal and an abdominal CT scan that was abnormal. And Dr. Wiley-Lucas in the Hanks case saw the patient on subsequent occasions for the same types of complaints. In fact, the plaintiff in Hanks even asked Dr. Wiley-Lucas, is my hepatitis C getting worse? To which the doctor answered, no, you've got pancreatitis. No, you're fine. So we know from Hanks that even if there are subsequent related complaints, it doesn't draw it back to that failure to inform the patient of the test results. Was the plaintiff's counsel correct in his attempt to distinguish Turner by suggesting that in Turner there was no continuous treatment in the sense that there were no additional office visits to affect the statute of repose? I don't believe that Turner referenced subsequent medical visits, Your Honor. I can't recall that, but I don't think so. But Turner was the first case that decided the issue that, and this has been the line of state for 20 years, the failure to report abnormal test results cannot form the basis for continuing course of negligent medical treatment. Why? Because the courts have determined that a failure to advise of test results doesn't constitute medical treatment. If it's not medical treatment, it can't be the source of continuing negligent medical treatment. It would be ordinary negligence, perhaps, but not medical negligence? Is that sort of what the cases are saying? I don't know that, Your Honor, but they distinctly say that the failure to advise of test results is not a form of medical treatment. That's in Turner, that's in Ferrara, and that's in Hanks. Hanks reiterated it most recently. And in Ferrara, the allegations involve both the failure to report the test results and the failure to treat. And in Hanks, the appellate court answered the question that the plaintiff has put before you, even if, and again, this is nowhere in the four corners of plaintiff's complaint. It wasn't pled that way. It wasn't. And this goes into my waiver argument, and that's why the waiver is important. The plaintiff was offered an opportunity to amend. My guess is he couldn't. But rather than amend and add additional allegations, he agreed to a dismissal with prejudice of the complaint. And as I stated in my brief, we're here in this court because plaintiff is claiming the trial court erred in dismissing her complaint with prejudice. The trial court only dismissed the allegation with respect to the failure to report the abnormal test result with prejudice. Well, isn't this nothing more than standing on the original complaint? I mean, how can that be a waiver if you claim that I'm standing on a complaint? And in order to get to the appellate court, why should I replead the same elements all over in a new complaint? Why don't I just stand on the complaint or in the alternative dismissal with prejudice? I mean, how is this some sort of waiver or estoppel or something like that? If your argument is that there were subsequent visits, there were other opportunities, and you don't take advantage of your opportunity to plead those facts, then that is waiver because this complaint, the complaint the trial court was faced with absent an amendment, was an allegation relating to a failure to disclose test results. And given the opportunity to include those facts and then failing to do so, I think that's where the waiver comes into play. If there were facts, if there were additional facts that could have been pled, they weren't. I wouldn't call it a waiver. Okay. The court told counsel you'll have an opportunity to plead facts based upon, but not based upon February 23rd. If you've got a cause of action based on something that happened after that, great. You can refile, but you can't base it on what happened or didn't happen or wasn't said or said on February 23rd. And then the defendant agreed to have it or plaintiff agreed to have it dismissed with prejudice. That's right. The report of proceedings is very clear here. The trial court's thinking is meticulously outlined, and what happened in that December 2016 court appearance is also there's no reason for dispute. It's set forth in the record. The discussion was do you want to amend and try to allege different facts, try to allege subsequent care, and the agreement that plaintiff's counsel made in that December of 2016 hearing was, no, we'll accept a dismissal with prejudice. And I do think that that is a waiver of his attempt to argue that there were any other facts that would have allowed him to state a cause of action. So Cunningham doesn't help plaintiff here. Cunningham does not work when the act or omission you're complaining about— of foregoing a right or privilege. A forfeiture, on the other hand, might be more apt. But the real point is that we review what's in the record. We don't review what's not in the record. And what's not in the record is an amended complaint that supposedly makes these allegations. And if he waived anything, he waived the right to amend the complaint. If the original complaint stated a cause of action, this argument on waiver is irrelevant, immaterial, because we look at the original complaint. If it states a cause of action, fine. If it doesn't, fine. If the forego or forewent the privilege or the right to amend it so that he could have stated a cause of action, we don't get involved in whether or not we should have sent it back and let him plead anew. We look at what the complaint is. We determine if it's failed to state a cause of action. And if it doesn't, we affirm the judgment. So when you say waiver, you're connecting something that has nothing to do with what we're reviewing. We're reviewing whether or not the original complaint states a cause of action. If he waived anything, he waived the right to amend it. But the right to amend it has nothing to do with our review, because it either states a cause of action with or without amendment, or it doesn't. I understand what you're saying, Your Honor. And I think I'm coming at it from a different point of view. I wholeheartedly agree with you that you have to decide on the face of this complaint whether the trial court properly dismissed the complaint that was on file. Yes, but if you argue that he waived this and you want us to affirm the judgment because of this waiver, vis-a-vis having us affirm the judgment because it failed to state a cause of action, as the record reflects, you're making an invalid argument. Is that what you did or not? No. I think my focus was, plaintiff is in this court saying that the trial court erred in dismissing her complaint with prejudice. And my point is the trial court didn't do that. The trial court gave her an opportunity to amend. Plaintiff agreed to a dismissal of her complaint with prejudice. Now she's here saying the trial court erred in entering that order. I don't think you can do that. For whatever reason, plaintiff agreed to that dismissal with prejudice. She's bound by that. Okay, we're getting into a semantical argument. Okay. And then any of them. Because he could be correct in saying that whether he dismissed it with prejudice or without prejudice, court committed error and we should reverse the trial court. Because the complaint as it stood stated a valid cause of action. And so the claim relative to with or without prejudice only has meaning for purposes determining whether we have jurisdiction to review the case. In other words, whether it's a final and appealable order. Right. That's the only significance of with or without prejudice in this case. And if the request for a with prejudice order was in order to secure immediate appellate review, he's got to live with the consequences of that request. Anything further, Bob? Nope. Thank you, Ms. Hatcher. Thank you. Mr. Smart, you may address the court on rebuttal. Thank you, Your Honors. Just first and foremost with respect to the waiver argument, there was no agreement. There was no acceptance. We sought a motion for an order without prejudice, and the court ruled on two different occasions that it was a dismissal with prejudice. I pointed out in my brief, there's nowhere in that the appellee can't point to that plaintiff in any way agreed to a dismissal. So I just wanted to point that out. In terms of going back to- But you were given the opportunity to replete, correct? Correct. I thought the court told you you could replete, but not based upon, simply based upon what happened on February 23rd. You had to replete facts that would bring you within the statute. Right. So in essence, he was limiting one portion of the cause of action but not allowing us to plead the whole picture. And for purposes of making it clear for the record, we wanted to get a better understanding in our subsequent motion to modify the order. And the judge, Judge Meyer, if you look at the end, when he denied our motion, so he denied that December motion, he said this order is in substance what I did. He dismissed the cause of action with prejudice twice, in essence. And that's really where the waiver comes in that they're referring to. So there was no agreement, no acceptance, anything along those lines. But Justice Burkett, going back to one of the things that you mentioned to counsel with respect to neurologic defects, right? So we have within our 2-622 our experts saying when the plaintiff developed in May of 2014 drop foot symptoms, right? That's a neurologic defect. So as the primary care physician, okay, there's your subsequent treatment, your office visit, that gets you within that continuous, unbroken, negligent treatment, okay, that tolls the statute of repose. All right? So that then goes to May 2014. Now we need to look back and say, well, this is something new. Right. This is something new, okay? We need to get to the bottom of this. We need to review past reports, all right? We need to refer you to somebody else. We need to do another radiological assessment. And so that's really a big factor in this case as it distinguishes from Turner and from Ferrara.  Turner is kind of the grassroots of this failure to inform. If you look at the complaint and you look at Turner, you look at Ferrara, you look at Hanks, all those courts, their decisions were based off of a single allegation of failure to inform. There's more allegations within our complaint, right? There's failure to treat. There's failure to monitor. There's failure to order subsequent radiology studies. There's failure to time and treat. So those are all things that are outside the purview of what Turner and Ferrara and Hanks have rested their opinions on. And it goes back to Turner, which says you need an office, you need a subsequent affirmative medical act for there to be continuous course of treatment with respect to failure to inform. And the subsequent medical act that you pled in this case was what? The office visits. That's pled in our complaint. She continuously saw the pledge. So you're saying merely office visits would be enough? Based off of the Turner decision? Absolutely. I'm going based off of what the precedent is in the state of Illinois. And our appellate court has said. Even if the visits would be for some new condition, you're saying? The Turner court says office visit is subsequent affirmative medical treatment. So then Ferrara goes on to say. Can I ask you a question? Sure. Would it matter whether it was for something that was symptomatically related to the test or could be anything new? Or does it matter? Based off of the Turner decision, it doesn't matter. And I think that's a big portion of our argument. But then we even go a step further and say, okay, if you don't think that an office visit is sufficient, even though based off of Turner, the precedent has said that that is that subsequent affirmative medical treatment. Strictly with respect to informing the patient of results, okay, then we still have a developed neurologic defect that would be that continuous course of negligent treatment that's specifically referred to in Cunningham so that we don't wind up with a situation like we have right now where a patient plaintiff cannot proceed with the cause of action due to no fault of his or her own. And that's really where we're sitting at today. All right, thank you very much, Mr. Smart. I'd like to thank both counsel this morning for the quality of your arguments and the presentations. The matter will, of course, be taken under advisement, and a written decision will enter in due course. We'll be in recess shortly.